In the Matter of **FORUM GROUP, INCORPORATED, Debtor– Appellee.**

**Appeal of Royce HARRELL, Wayne S. Tush, Ken Veil, et al.**

No. 95–2091.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 2, 1995.

Decided April 22, 1996.

to termination benefits agreements (TBAs) they had each entered into with Forum. However, the TBAs, essentially golden parachutes, had been rejected when Forum went through a voluntary bankruptcy. The executives therefore filed unsecured claims for damages in the bankruptcy court. The bankruptcy court allowed the claims over Forum's objection. On appeal, the district court reversed the bankruptcy court, finding an "acquisition of control" had not occurred at Forum, as defined and required by the TBAs. The executives appeal. We affirm the district court's ruling.

## I.

Forum owns and operates retirement communities in several different states. Prior to 1991, Forum experienced serious financial problems, precipitating the filing of an involuntary bankruptcy petition on February 15, 1991. Thereafter, on February 19, 1991, Forum and twelve of its subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States District Court for the Southern District of Indiana. Forum continued to operate its business as a debtor in possession pursuant to 11 U.S.C. §§ 1107, 1108.

Creditor and Equity Committees were formed, and negotiations to restructure Forum's debt and agree on a reorganization plan commenced. The negotiations continued for several months and were often highly contentious. On August 9, 1991, however, Forum filed its Third Amended and Restated Joint Plan of Reorganization ("the Plan") and an accompanying Second Amended and Restated Disclosure Statement. The Plan was supported by Forum, whose board of directors unanimously voted to approve and recommend the Plan after reviewing its contents. The Plan was also supported by the Creditors' Committee and eventually by the Equity Committee. All three groups recommended that the creditors and shareholders vote to accept the plan. The first page of the disclosure statement read:

> The Debtors, the Creditors' Committee and the Equity Committee believe that confirmation of the plan is in the best interests of the debtors, creditors and in-

Leonard Opperman (argued), Scott C. Quick, Kunz & Opperman, Indianapolis, IN, for Wayne S. Tush, Ken Veil, Wayne L. Beverage and Larry L. Laird.

James D. Blythe, II, Blythe & Ost, Indianapolis, IN, Leonard Opperman, Scott C. Quick, Kunz & Opperman, Indianapolis, IN, for Royce Harrell.

Thomas C. Scherer (argued), Bingham, Summers, Welsh & Spilman, Indianapolis, IN, for Forum Group, Inc.

Before COFFEY, FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

The plaintiffs were executives at Forum Group, Inc. ("Forum") until they were terminated in 1992. Following their terminations, the executives sought compensation pursuant

terest holders. The Debtors, the Creditors' Committee and the Equity Committee recommend that you vote to accept the plan.

Further language in the statement declared:
The Debtors believe that the plan provides the greatest and earliest possible distributions to creditors and interest holders. The Debtors therefore believe that acceptance of the plan is in the best interests of each class of creditors and interest holders, and recommend that you vote to accept the plan.

The Plan was accepted in accordance with the Bankruptcy Code and finally confirmed by the bankruptcy court on April 2, 1992.

Under the Plan, Forum exchanged prepetition debt for equity in the reorganized Forum, giving former unsecured creditors 93% of Forum's new common stock. Forum's secured debt was also restructured. The Plan granted the Creditors' Committee the right to select the officers and directors of the reorganized Forum, excepting one initial director who was to be chosen by the Equity Committee. A list of the proposed directors for "New" Forum and an outline of their qualifications was appended to the Plan, and the appendix was specifically referred to in the text of the Plan. Upon confirmation of the Plan, the old directors were deemed to have resigned and the proposed new directors were deemed "elected as Directors of New Forum." Finally, the plan rejected a variety of pre-petition agreements, including the plaintiff executives' TBAs.

■ The executives were all employed by Forum prior to confirmation of the plan; their tenures ranged from five to seventeen years with the company. Each had entered into an identical TBA, i.e., a golden parachute agreement, with the company when he joined the company. Golden parachute agreements typically provide corporate officers a certain amount of security in the event of a corporate ownership change (often continued employment or the payment of a lump sum). *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 3 n. 2, 105 S.Ct. 2458, 2460 n. 2, 86 L.Ed.2d 1 (1985); *Cline v. Commissioner of Internal Revenue,* 34 F.3d 480, 486 (7th Cir.1994). According to the terms of the agreements at issue, the executives are entitled to termination benefits if (a) an "acquisition of control" occurred, and (b) the executive left Forum's employ within one year after the acquisition of control. An "acquisition of control" is defined in the contracts as "a change in a majority of the members of the Board of Directors of the Company during any two (2) year period *unless the new directors were elected or recommended by two-thirds (2/3) of the members of the Board of Directors in office at the beginning of such period ....*" (emphasis added).

Within six months of the confirmation of the bankruptcy Plan, all five plaintiff executives were terminated. In most instances, the termination was without prior notice, and the executives were given only one hour to remove their possessions from Forum's premises. The executives originally sought compensation pursuant to the TBAs, but upon discovering the agreements were rejected under the Plan, the executives filed unsecured claims for damages in bankruptcy court. The bankruptcy court, over Forum's objection, allowed the claims and awarded the executives various amounts in termination benefits. The bankruptcy judge seemed troubled by both the shotgun nature of the firings and by the fact that the executives were apparently unaware that the TBAs had been rejected. The executives testified that had they known that the TBAs had been rejected by Forum, they would have left Forum's employ of their own initiative much earlier. In the bankruptcy court's judgment, the executives were treated unfairly.

Forum appealed the bankruptcy court's decision to the district court. The district court determined that no "acquisition of control" had occurred as defined by the agreement. The court found that by recommending the plan, which included a list of the new directors, the "old" directors had "recommended" the "new" directors, thus negating any acquisition of control and any possibility of benefits under the TBAs.

## II.

■ Parallel to a district court's review of a bankruptcy court decision, we set aside a

bankruptcy court's factual findings only if they are clearly erroneous. On the other hand, we review *de novo* the bankruptcy and district courts' conclusions of law. *Matter of Love,* 957 F.2d 1350, 1354 (7th Cir.1992). Traditionally, the interpretation of an unambiguous contract is a question of law. *Bechtold v. Physicians Health Plan of Northern Indiana, Inc.,* 19 F.3d 322, 325 (7th Cir. 1994).

The only issue we must decide is whether an "acquisition of control," as defined by the TBA agreements, occurred at Forum. It is undisputed that if there was an "acquisition of control," the executives left Forum within one year of its occurrence and are entitled to termination benefits. According to the agreements, such an acquisition occurs if a) there is a change in a majority of the members of the board of directors and b) the previous board of directors neither elected nor recommended the new directors. It is uncontested that upon confirmation of the reorganization Plan, a majority of the members of the board of directors were replaced by the persons proposed in the Plan. It is also agreed that the previous board of directors did not elect the new directors. Therefore the sole question before us is whether the old directors "recommended" the new directors within the meaning of the TBAs.

■■■ The TBAs stipulate that Indiana law governs the interpretation of the agreements. Under Indiana law, the primary goal of contract interpretation is to give effect to the parties' intent. *See Trustees of First Union Real Estate Equity and Mortgage Investments v. Mandell,* 987 F.2d 1286, 1289 (7th Cir.1993). When the terms of the contract are clear and unambiguous as written, those terms are conclusive as to the con-

tract's meaning. *Id.* The court will not look to extrinsic evidence in construing unambiguous contract language. *Jackson v. DeFabis,* 553 N.E.2d 1212, 1215 (Ind.Ct.App.1990). Words or phrases used in a contract are afforded their usual and common meaning. *Mandell,* 987 F.2d at 1290. When the parties have defined their mutual rights and obligations in a written agreement, the court must enforce those terms; courts are not at liberty to fashion a new contract. *Rodman v. City of Wabash,* 497 N.E.2d 234, 240 (Ind. Ct.App.1986); *Jennings Realty Corp. v. First Nat. Bank,* 485 N.E.2d 149, 152 (Ind.Ct.App. 1985).

■■■ Using the foregoing principles as our guide, we find that the previous directors of Forum "recommended" the new directors as the term is used in the TBAs. It is unquestionable that the old directors of Forum "recommended" the terms of the Plan of reorganization to the creditors and shareholders. Prior to issuing the disclosure statement and Plan, the old board unanimously approved the Plan and voted to recommend its adoption. They twice stated in the disclosure statement that the terms of the Plan were in the "best interests" of the company, creditors and shareholders, and twice specifically recommended that the creditors and shareholders "vote to accept the plan." [1] One term of the recommended Plan instructed that the board of directors was to be reconstituted, and it specifically referenced the appendix which listed the new directors that had been chosen. Thus it logically follows that the old directors "recommended" the new directors. In other words, by recommending that the entire Plan be accepted, the directors necessarily recommended each of the Plan's specific provisions, including the list of new directors contained in the Plan.[2]

1. The executives argue that the recommendations contained in the disclosure statement cannot be attributed to the old directors since the directors are not specifically named in the recommendation (only the Debtor, Creditor Committee, and Equity Committee are mentioned), and the old directors are not included in the disclosure statement's definition of Debtors. First, this argument was not made before the district court and is thus waived. *Teumer v. General Motors Corp.,* 34 F.3d 542, 545–46 (7th Cir.1994). More importantly, it is apparent that

in this case the board of directors was the voice of the debtor company. Therefore, the recommendation of the Debtor was essentially equivalent to the recommendation of the Debtor's board of directors.

2. It does not concern us that the board of directors did not separately approve and recommend each individual item in the Plan. The record shows that at the time the board voted to recommend the Plan, the previous board members were aware of the provision calling for their

Our conclusion is consistent with the usual meaning afforded the term "recommend." In common usage, "recommend" means "to present as worthy of acceptance or trial," "to suggest as appropriate, beneficial, or the like," and to "present with approval: indicate as being one's choice for something or as otherwise having one's approval or support." *See respectively* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 985 (1990); THE RANDOM HOUSE COLLEGE DICTIONARY 1103 (1980); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1897 (1993). It is apparent to us that by recommending the plan of reorganization to the creditors and shareholders and including in the Plan a list of the new directors, the old directors conveyed to the voters that the listed persons were acceptable and worthy candidates. The previous directors' recommendation of the Plan was a clear sign that the proposed directors had their approval and support. Thus, under the unambiguous language of the TBAs, the previous directors "recommended" the new directors, and no "acquisition of control" occurred at Forum.

The executives argue that our reading of the TBA language fails to consider and incorporate governing Indiana corporate law. They claim that Indiana law provides only two methods of replacing directors: 1) old directors may select them or 2) shareholders may elect them at an annual shareholders meeting, citing Ind.Code §§ 23–139; 23–109; 23–133(c). Reading the language of the TBA in the context of this background law, the executives conclude that the term recommend must be interpreted to mean "recommend the election of the new directors to the shareholders." And since the old directors did not recommend *the election* of the new directors, the executives maintain that an acquisition of control occurred. We believe that the executives' argument falters on several grounds.[3]

First, the executives in effect ask us to violate several longstanding principles of contract interpretation. If we were to accept the executives' interpretation of the term recommend, we would be abandoning the term's common and usual meaning, as defined by the dictionaries quoted above. More importantly, the executives cite Indiana contract law for the proposition that "courts can only enforce the terms of the contract as agreed upon by the parties, and have no authority to make a new contract." *Wabash Ford Truck Sales, Inc. v. Ford Motor Co.,* 472 N.E.2d 611, 614 (Ind.Ct.App.1984); *see also Rodman v. City of Wabash,* 497 N.E.2d 234, 240 (Ind.Ct.App.1986). However, by asking us to read the term "recommend" as they suggest, it is the executives that seek to fashion a new contract, by adding terms not included in the agreement as written and agreed upon. A court may not "create a contract for the litigants, nor supply omitted terms while professing to construe the contract." *Rodman,* 497 N.E.2d at 240. The TBAs do not say "recommend the election of the new directors to the shareholders," they simply say "recommend the new directors." These words are clear and unambiguous; therefore we interpret and enforce them according to their plain and natural meaning. We decline the executives' invitation to rewrite the benefit agreements.

Additionally, we are unconvinced that the directors did not "recommend the election of the new directors to the shareholders," as the executives claim must occur under the TBAs. Forum argues that the confirmation of the Plan may appropriately be viewed as an election of directors consistent with Indiana corporate law. The order confirming the Plan specifically deemed the new directors 1) "to have been elected as Directors of New Forum" and 2) "to be initial directors of New Forum for purposes

replacement and were familiar with the proposed directors. Further, one previous board member testified that it was his understanding that by approving the Plan as a whole, the board was officially recommending all provisions contained in the Plan. Thus, it is sufficient that the board approved and recommended the Plan as a whole package.

**3.** As a preliminary matter, we note that the executives do not appear to have made this argument to the district court and thus likely waived the contention. *Teumer,* 34 F.3d at 545–46. However, because Forum does not object to the matter on waiver grounds, we will address it on its merits. *See Garlington v. O'Leary,* 879 F.2d 277, 282–83 (7th Cir.1989).

of [Indiana law]." The confirmation order also constituted "all approvals and consents" required "by the Indiana Business Corporation Law." Further, the shareholders did vote to accept the Plan, which, by one of its terms, installed the new directors. Indirectly then, the shareholders did vote to elect the proposed directors. Thus, if confirmation of the Plan is considered an election of the directors under Indiana law (as the bankruptcy court stipulated), then the old directors' recommendation to the shareholders to accept the Plan can be viewed as a recommendation to elect the new directors to the shareholders. Therefore, an "acquisition of control" did not occur even under the executives' embellished version of the agreements.

■ Finally, if the executives are unwilling to view the confirmation of the Plan as an election of the directors, then they must concede that the facts of this case demonstrate that there are more than the two ways described in Indiana law by which directors can be replaced. The executives do not challenge the validity of the procedures through which the new directors of Forum were installed. Therefore the executives essentially admit that, regardless of Indiana law, new directors can be replaced through a reorganization pursuant to Chapter 11 of the Bankruptcy Code. In fact, the Code seems to contemplate such a situation. The Code allows a plan of reorganization to provide the manner of selection of officers and directors of the reorganized company, "notwithstanding any otherwise applicable nonbankruptcy law," as long as the provisions are consistent with the interests of creditors and shareholders and with public policy. 11 U.S.C. § 1123. Further, the Code provides that a plan of reorganization be confirmed only if it "has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor...." 11 U.S.C. § 1129(a)(5)(A)(i).

Thus, in this case, the Plan granted the Creditors' Committee the power to select the new directors, with the exception of one selected by the Equity Committee. The Plan identified those selected and declared when they would assume control. In the order confirming the Plan, the bankruptcy judge deemed the old directors to have resigned and the new directors to have been elected directors of New Forum. The same confirmation order made clear that provisions in the Plan trumped any contrary Indiana law: "*Except as otherwise expressly provided herein or in the Modified Plan*, the corporate governance of New Forum, and the election and appointment of the directors and officers of New Forum shall be carried out in accordance with the Charter, the By-Laws and the laws of the state of Indiana." Given that Indiana law does not control all potential means of replacing directors, we refuse to strain our interpretation of the term "recommend" beyond its common meaning in order to incorporate it into the agreements.

### III.

By repeatedly recommending that the shareholders and creditors of Forum vote to accept the proposed plan of reorganization, which named the directors who were to serve the reorganized company, the previous directors "recommended" the new directors within the meaning of the TBAs. Therefore, although we do not condone the manner in which the executives were treated by Forum, we must conclude that no "acquisition of control" occurred. Hence the executives are not entitled to termination benefits and we AFFIRM the order of the district court.